The next case for today is number 2015-31094, Neiman v. Bulmahn, et al. Hello. You may proceed. Stuart W. Emmons for the Plaintiff's Appellants. We ask today that the Court reverse the District Court's order granting defendants' motion to dismiss. The plaintiffs alleged a plausible claim for securities violations. Now, on this appeal, we've narrowed our class period a little bit. The focus of this appeal, we've narrowed it down to August 2011 through August 17, 2012, and that's the day that ATP filed for bankruptcy. We think our allegations are stronger during that period, so we decided to focus on those. Now, it's clear that by this August 11 time period and then even more so by 2012 that ATP's liquidity and its financial condition was in serious trouble. It was a big mess. But despite that fact, ATP made—or defendants, rather, because ATP's in bankruptcy. Defendants made statements such as, quote, liquidity was sound, end quote. Quote, ATP has a strong capital position, end quote. ATP's, quote, cash flow is improving, end quote, and, quote, increasing, end quote. And then as late as May 9, 2012, and this is about one month, maybe a little more, before ATP went out and hired bankruptcy advisors, the defendants say ATP was, quote, very well within our financing capability, end quote. Well, you know that that can't be true. Well, obviously the district court went through statement by statement, and we have different legal regimes for the past, present statements, opinion, fact, future. Yes. So why don't you start—it would help me if you would start with the statement that you think is most actionable under the law. Would it be well for? I would say I think that the most actionable statements are going to be those that address the liquidity, the liquidity strong, strong capital position, and particularly I think the claims are strong throughout 2012 and beginning to that time. Okay, well, if you want to go with the liquidity opinions, those seem to be governed by the Omnicare structure. And so the way I look at the liquidity statements is those are part and parcel with Clipper because it was we have enough liquidity to pay out Clipper. And so if I think of them together, the most difficult part of your position is that at the same time as they're saying we're sound, we have liquidity, they are giving considerable disclaimers, meaningful cautionary language. Well, I wouldn't say that the cautionary language was meaningful. I don't believe it was much more meaningful than the, if any, than the language that the Court found insufficient in the Lorman case. But, okay, let me go ahead and finish because you just said it wasn't meaningful. Let's start with the 2011 form 3K. ATP warns, quote, despite our anticipated production growth, we remain highly leveraged. Servicing our debt over the long term will continue to place significant constraints on us, makes us vulnerable to adverse economic conditions. Specifically, financing derivative, et cetera, significantly burden the future net flows from our production. So they're saying we're sound to the market and to investors, but they are giving pretty strong cautionary language that we're really leveraged, we don't have much production flow, and it's going to affect and impair future income stream. Well, what they don't disclose is they don't disclose that they'd so leveraged their assets that that's apparent now after the bankruptcy that they couldn't borrow against them. They had sold all their future production in the form of net profit interest and they'd sold them in ORIs for present. I just read that. Certain of our financing derivative transactions requires to make payments in future periods from the proceeds from the sale of production. Well, it describes the problems could occur in the future, but it doesn't say that the problems were, you know, apparent then and there and that the company was out of cash. It gives no indication how much of this production revenue that ATP got to keep for itself. Would the logic of your position, that's a factual problem, would the logic of your position mean that they could have given no opinion other than that we're in an irreversible death spiral? Well, no, they didn't have to stand up and say our liquidity is strong and we got a great capital position in one and two, three months before. Be precise. That may be true. When you say great capital position, is that a phrase they use? I've got the quotes here. I'll give you the quotes, and we've got them quoted in the brief. Okay, here's one, April 17, 2012. This is two months before they hired the bankruptcy advisors, one month before the new CEO, Mayor Carroll, came on. Just go ahead. Is there a great capital position statement? Okay, there is. I quote, liquidity was sound, end quote. Quote, a strong. It doesn't say great. It says, quote, a strong capital position. Because in Omnicore, the court says, as an example, okay, our position is lawful, and yet the underlying contradictory fact is they hadn't spoken to a lawyer. Here, the statement is we've sound. The underlying facts are, but look at our leveraged position, and this will impair future revenue stream, and we're highly leveraged. I guess I'm asking for a case that says that that type of opinion statement, present tense opinion statement, is actionable with those cautionary languages. Well, this kind of maybe goes to the Virginia bank share cases. Not cases, the Virginia bank share case, which says that if you put out some sort of corrective, like truth on the market information, it's got to be to such extent that it neutralizes whatever you say. What's the site? I'm sure it's in your brief. It's in the brief. I don't have it written down. It's Virginia bank shares. It's cited all the time. Okay. And so it's just. So it has to neutralize. It has to exhaust the ability of it to mislead is, I think, the term. And really, these are fact questions. These are really questions, jury questions, that nowadays everybody's trying to decide these things on a motion to dismiss. But it's a question as did whatever these warnings, which we think are, you know, we don't give them quite as much credit as you are. We don't think they're all that terribly meaningful. Whether that is enough to neutralize these statements so that, you know, investors go out there and they say, okay, well, you know, there are some disclosures here that the ATP is having financial problems. But, hey, these executives who are in the know, they say the financial position is strong. So that must mean they know they can go out there and borrow some more money. They can complete the Clipper pipeline. They said they're going to have this thing done in the fall of 2012. The pipeline is pre-funded, quote, pre-funded, meaning it's already paid for. And Clipper is going to save the day. It's the biggest whales they've ever had. It's almost going to double their production. And everything's going to be great. And Virginia Bank shares also. Another point Virginia Bank shares. The pre-funded statement is a statement of fact. It is a statement. It's a present statement of fact. Now, remind me which defendant made that statement about pre-funded. Was that Reese? That is Reese. Reese was the one who made most of the statements. He's the CFO. He said he was, you know, right in the middle of everything. How did the district court resolve that? Could it have meant that Reese said we have future stream of income that we'll pay for Clipper? I'm not sure I understood your question. In other words, what's the record evidence showing that the allegation — what was the falsity in that statement? That it was pre-funded? Yeah. Is it reasoning from day two, the bankruptcy, that it wasn't? Well, it really came out in the bankruptcy that ATP had only spent 20 of the $150 million that it was going to take to complete the pipeline. Yes, but that could be consistent with their approach to leveraging future. In other words, we are pre-funded because of the future stream of income. You mean because — Well, for. From Clipper? Oh, from well for. Well, by that time, well for turned out to be a pretty big disappointment. I mean, it still was delivering 3,500 barrels. Help me to understand something about that. The statement was made early on that well for was going to give them 5,000 or 6,000, but apparently it was capped. So then when you went back, then you realize that it's not going to be a producing well of that magnitude. It's going to produce far less. They learned that. Yes, sir. My question, though, is when did that happen? Is it a circumstance where they perhaps thought that this was going to be the producer, but when they went back and started to reopen the well and to bring that on production, they knew immediately then that this was going to be something like that? Or was it a situation where over time they nursed it and it just didn't come together? The situation — we don't have the benefit of discovery. We don't have any of the documents. We haven't proposed to anyone. We were able to get some information from a few confidential witnesses. What kind of discovery have you had? We have none. This is a motion dismissed. This is a pleading. Sometimes you get some discovery before that. Oh, no, they don't. District courts will never let you get them in a PSLRA case. There's a discovery stay. You cannot get any formal discovery. Okay. That's why they always — I don't know. Did Tate say when the production declined? Well, the evidence suggests — the evidence suggests that the production declined immediately right around August 24th. But did Tate say that in the November — Yeah. Let me tell you what he said. I've got it written down here. Tate said — I don't think he did say that, but you — No, no, no. He said when we brought it on to completion, there was a drawdown in the loss pressure, and then we were only getting 3,500. Right. But it would be critical to know when that happened if the alleged false statement is Reese's statement in September. So if Tate isn't the contradicting factor, then it's the internal reports attached to the emails that the confidential witnesses said the higher-ups were getting. Correct? The higher-ups are getting weekly production reports that have it per well and company-wide. And so they're going to know what the production is. Well, when you say they're going to know, what's your best case that an email going to an executive is presenting them — they'd have to go into that PDF, they'd have to go down well by well. This isn't a single well. It's 25 percent of the revenue. It's a big well. It's a big well. But what's your case that says that that allows us to impute knowledge,  they'd have to see it and say, oh, that's not what I said back in August. It's no longer 7,000 barrels a day. It's now 3,500. That's the reasoning that you're saying allows inference to center. What's the case that stands for that? You mean — That internal reports can be attributed, imputed. The knowledge can be imputed to the executives that receive the emails. I'm sorry. I can't cite you specifically. I mean, I could see if well four were the only product and if there were just four employees, but this is a mid-sized company and they had a lot of wells. This one is significant. It's not the sole. So the logic you urged in argument to Judge Vance was that that alone, and you do need a case that stands for that. Well, it's circumstantial evidence of CNR. And really for these PSLRA cases, Intel Labs set the standard and everybody follows it, is that you've got to view the evidence, the totality of the evidence. So in this case, you take all the stuff that came in the bankruptcy was revealed, which is very closely connected in time to the statements. Now, you're talking about the well. That goes back a way. Well is September. Bankruptcy is the fourth one. Yeah, but you take all your evidence, look at it in the totality. The executives receive the report. Tate said that the well drew down to 3,500 barrels basically immediately upon. Why? You've got to be careful about attributing words to the record. He didn't say basically immediately. Okay. He said after production. If he'd said capital's great, if he'd said immediately, then you've got real problems to draw from. But if you add those words and they don't exist, that's problematic. Did he ever say immediately? Let me get the exact language here so we can work with it. What he said is, and here's the quotes, quote, as ATP brought the well on production, and I'll have to turn to get the full quote, I'll have to turn to. Go ahead with your argument because he didn't say immediately. No, no, I'm sorry. That is an inference that is taken from, you know, the admission that it was upon production because the inference is that production started on August 20th. The actionable restatement is one month later. So we're talking about a short time. It is a short time, but this is an important well. In fact, I'll tell you how important it is. It's about 23% of the revenue. It's about 23% of the revenue. It's the first well that had come on after the moratorium. Now, I'll give you the exact quote here since that's what you want. Bowman said in the August 24th, 2011 conference where he announced the 7,000 production and 31,000 overall production is, quote, we have finally realized the planned material production revenue of this well that has been much anticipated for 16 months, period, end quote. So they're getting everybody excited about this well. And, you know, Reese didn't have to start speaking about production at this conference if he didn't know what the numbers were. I mean, this is an important well that everybody's interested in. It's the first one that's come on, and they really need the production because they're going broke. I agree. You know, it's important. We've got to be able to draw some inferences from, you know, circumstantial evidence is permissible. And you've got to keep in mind that we don't have discovery here. This isn't summary judgment. We can't get subpoena witnesses. We can't get them to speak under oath. So sometimes you can get a witness to talk to you, but you can only get what they're willing to tell you. And sometimes they're a little uncomfortable, you know, because they're afraid of getting in trouble in the industry, retribution or whatever. And that's what makes these cases difficult is the fact that you just don't get discovery. But the standard, you know, you don't have to. The standard is we do not have to prove our case on the pleadings. We just have to allege a plausible claim for securities violations. Now, the standard is a bit higher for Center. I'm sorry? Your time is up. Oh, my gosh. Thank you. May it please the Court. Paul Bassett with King & Spalding for the defendant officers and appellees. Judge Vance properly dismissed this case under the PSLRA, not once but twice, with two very lengthy 70, 80-page opinions detailing plaintiff's allegations, providing all the appropriate inferences, and dismissed this case twice, the last time with prejudice. Let me take you to well four. As I read the statement in context, the reese, I guess it's the speaker, said, really stressed the importance of well four. I mean, the strength of that comes from his mouth, not from any inference. That's very, very clear. And he's talking about a substantial percentage of production. Now, my question is whether reasonable inference can be drawn from that. But it assumes that I know what's meant by some of the language. When he first made that statement, that is, when the well first came in, he was relying on that 7,000-figure thing. My question is, what was the status of the well then? And then when did he learn that that was going to be nowhere near that? And that goes back to what was it that they did to learn that. My impression is from that that they thought that they had all the pressures and the particular seismographic readings and structures told them that this was going to be a high-producing well, et cetera. But then when they went back to reopen the well and bring it on production, it wasn't there. Because they used this language about efficiency and so forth. And some of that's old-school jargon. But tell me, as best you can, what is the situation? The first statement is a very, very strong statement. And then later they found out that's way off. What happened? How did they first learn, and how did they learn it? Okay, Your Honor. Good question. So the timeline is this. The company makes its announcement in August based on a well test, and it announces overall company-wide production, including well number four, which is about 7,000 barrels equivalent per day. Three weeks later, Mr. Reese, who's the CFO, is at the Rodman-Renshaw Global Investment Conference, and he's actually talking to the conference attendees about the August announcement. He is not talking about any current production. He's not an operations person. He was talking about the August announcement. And it's very important to understand that the system of our securities laws does not require continuous disclosure. Mr. Reese, because he's talking at a conference. Just stay with the facts for a moment. So in the Second Amendment complaint, what we see is alleged is that Mr. Tate, in November, says that the August announcement was based on a well test. But as production went online, they discovered that the pressures weren't there, and it was about half of the production. He doesn't say when. Well, as it came online. Now, it's one thing if it came online and you still expect it. When it came online, my understanding is, and what I took from that, and that's what I want you to help me with, is that when they came on production, they knew then that this was not 7,000 barrels, that this was something far less than that. Now, perhaps it's the case that they didn't know then. It may be a little disappointing, but it just didn't work out that way. And then at some later point in time, they realized that. But it matters in terms of, to me, as to the reasonable inferences, as to when did they learn that. You can answer that by saying, well, what did they do that told them that that's not a 7,000 producer? They didn't have to wait around for months to know that. What I took from that is the moment they started bringing us on production in those few hours, they knew then that they didn't have that well. And the problem with that question, Your Honor, is it's not answered. I don't have a problem with my question. What's the answer to it? Well, it's not answered in the complaint. There are no facts in the Second Amendment complaint, nor were there in prior complaints, as to when they learned, what day, and by whom. I respect that. I understand that. And that's why my question goes to the statements that is in the record about when he said that when they went back and the efficiency wasn't there with the languages or whatever. Yeah, the quote in the complaint, Your Honor, is that, and what happened was during the completion, we got the well test was indicating that, the 7,000. As we brought the well on production, what we saw was a completion efficiency where there was more well bore drawdown near the well bore. As we brought the well on production, we saw what? We saw a completion efficiency where there was. A completion efficiency. Okay. Tell me what that is. Your Honor, I'm just reading the Second Amendment. I know you're reading it, but what does completion efficiency mean? I'm not ignoring that. In the oil field business, it means something. It means so much that that's all he said. Right. I think he was explaining, at least the quote that he's explaining, how they learned that the 7,000 barrel equivalent per day was less than that. He doesn't say when. Okay. What does completion efficiency mean? I don't know, Your Honor. I thought they also alleged that, at least through the confidential witnesses, that Reese was getting weekly reports as to each well. And, therefore, before September 12th, Reese would have seen that the production wasn't at 7,000 barrels a day. Well, the allegation is essentially what you're saying, Judge Agenson, is that, and we know from Abrams and Southland and other Fifth Circuit cases that the mere receipt of some internal reports, by email or otherwise, that might have conflicting or contradictory information is not enough to show C enter. Plaintiffs would have to plead that Mr. Reese knew how and when that the production, because as your question to counsel indicated, there's 100 wells that ATP has. And if there's an email with some production. But there is some line. The Nathanson case, if it's a small enough company, it's relatively small. And if they flag the email and say, take a look at well four, then that would be sufficient. So I guess what's the best case, the verb that seemed to come out of Goldstein was presented. Was he presented with that inconsistent internal report? There's no allegation to that effect. The six or so confidential witnesses, Your Honor, say essentially at bottom that he had access. It was in his inbox. And what's the best case that draws that fine distinction between access isn't appropriate to impute but presented is? Well, I would say, Your Honor, the very case you were on in the Owens case, an asset, the special circumstances lines of cases are very narrow that may tip the scales towards C enter. A big enough asset you can assume the exec would look at it. And a 22% asset in Owens was not enough. And I would say that's exactly the same case here. When you have 100 wells, yes, you have one that's come on, the first one since the moratorium was lifted. It's close, but I appreciate the answer. What about the statement that Clipper was pre-funded? That seems very problematic. And it was. And that statement, I believe, was made in one of the bankruptcy first day hearings. And so there's no allegation really beyond that. There's nothing in the record what he meant by that. What you can do is look to the financial statements and see that in the first quarter of 2012, in the first quarter of Q, that actually comes out in May. So we're talking really at the end of the class period where they talked about selling an NPI, an ORRI, which put $200 million of cash into the company. So this goes to a larger point, which is the data in the financial statements at the 2011 10-K and the 2012 first quarter Q underscored the optimistic statements the company was making. But that could have been the pre-funding. I thought he made that at ROA 6058. Reese made that. Clearly, we are very successful in putting together an override. $100 million item that is pre-funded. Well, basically, is that not about that? I think that is, Your Honor. Is that before the bankruptcy? I didn't recall any of that. I thought so. It probably was because if you look at the timing, that first quarter sale that put that much in cash infusion and cash flow and liquidity into the company was certainly something the company was looking at to pre-fund Clipper. And, by the way... But why isn't that a problem then? Well, it's not a problem if you look at the timeline, Your Honor, because planners are complaining about statements and they try to hone it down in terms of time. But if you look at the end of 2011 or in 2012, even leading up to May, right? Well, they make a transaction in Q1 that puts 200. They have $225 million. It's in the 10-Q that comes out in May. They have $225 million of liquidity in the first quarter of 2012. By June 30, that liquidity has dwindled down to $25 or $30 million. And by June, they're hiring restructuring advisors. So it is obviously something the officers thought they had some liquidity, but they had the warnings that if production didn't continue or accelerate, they were going to be in a cash squeeze, and that's exactly what happened. They predicted this with the detailed and repeated warnings that Judge Vance talked about. Through several, I mean, we have to parse statement by statement. The Bloomberg News statement didn't come accompanied by cautionary language. Is that fair to say? Mr. Moody was quoted in Bloomberg. He says, I can't respond to rumors, but I can deliver on the promises. Right. Okay. Right. He was being quoted in that report. I don't believe that had cautionary language in it. He's trying to dispel Moody's report. He disagreed with the characterization. And, again, the case law is clear on that point, which we've cited, that as long as the data is there in the financial statements, which it was, and the company is making guardedly optimistic statements, they don't have to go out and say, yeah, we agree, we're going to go into bankruptcy in six months. What about the fact that this isn't future looking? We are well within the financing capability. That's today. That's not future. And they're in a difficult spot even then with financing capability because they know that the money is already having to be applied to the other obligations. Well, Your Honor, what time frame are we looking at for your statement or for your question? That same Reese's non – I thought this was early in the year. I mean, the timeline is important because liquidity was in a state of flux for the company. And to counsel's point of, well, we didn't know the extent or the cash drain at the NPI. How much flux is it downward? It's going down. But all the data was there. And so the company, under GAAP, the company was required to and did treat the NPIs and the overrides and listed them on the balance sheet. So they had every transaction, every balance, how much they had paid during that period, and most importantly, what they expected to pay over the next 12 months. That was all in there. So to counsel's point in the briefs and even alluded to this morning, 2011 10-K, you could easily look at the financial statements and show that 50% of the production revenue was used to pay NPIs and overrides in 2011. 50% of its production revenue. Is that less than the pleadings? They allege – their question is, well, we couldn't tell at all. It sounds like it was all. But it's not, and the data is there. And any reasonable investor could see that. You're referring to a 10-K. Was the 10-K part of the pleadings? We're supposed to look at the – you wanted to find this, the plaintiffs. Yes, it is, Your Honor. It's referred to in the – It's referred to, but then you go – you make full use of it because it's a 10-K? Yes, Your Honor. I'm concerned about – Congress has made it difficult enough for plaintiffs. That's a judgment call. I don't comment on that. But – and then when you enforce the district order, like no discovery, so you amend and cure these problems, you have this very awkward situation. And frankly, I don't quite – I still don't have an answer to my question about the – well, four. I'll take you back to that. I'll skip back off of the 10-K for the moment and leave that to one side because I didn't remember that they affirmatively pledged what you're quoting from. And you're going to have to stay within the dimensions of the pleadings themselves. If you – if they're going to allow you to go get found in all the other circumstances and so forth that are not part of the pleading, then that plaintiff should be able to do that too. Let's see. September the 12th, Breeze spoke at the Rodman Global Investment Conference, and he said he produced – totaled production at 31,000 barrels. Then he goes on, and he said, you can see the numbers here. And they – but what had happened is that in August of 2011, they began production of well four. And they put up press release lauding the anticipated new production. They delivered 7,000 barrels a day. That's 7,000 of a total of 31,000, quite plainly material on his face. Then what we found is that well four was actually producing far less per day, and we say that that was disclosed in November of 2011. So we start off with August, and we bracket it with November 2011. So we're talking about that time span. The well came on, and at the outset you were saying this is what this is. That's anticipated production. But then when you knew that, the question is when you came on production, and that's pretty early. And if I read this, I come back to that. As I read this, the reasonable inference to be drawn from that was that when they came on production, they knew it then. I would counter your – That's what I'm reading. Tell me why that's wrong. The question is, right, is defendant by defendant. So we're talking about Defendant Reese. And the most reasonable inference for Defendant Reese is he disclosed in November when the roll-up and the announcement of the Q3 finances. Because why lie in September to tell the truth in November? There's no motive to do that, and that's what Judge Vance said. There's just no scienter here, and there's no – You're shifting to scienter. I'm talking about falsity for the moment. Right. And when was the false statement made? And the reasonable inference here is that rather early on, that statement was false. Now, the question is – so you're back to scienter. And my question, though, is – turn the question around. Why is it a reasonable inference to assume there's no reason to mistake this other than to keep this thing afloat? Your Honor, the more reasonable inference is he didn't know. If Mr. Tate, the actual operations officer, knew at some point after August – You're saying that the guy that made the statement did not know that, what, nearly 20 percent of their production wasn't going to be there. He may not know day to day or week to week. Not day to day, but wouldn't it – And he was actually talking about the August 24th announcement and answering questions about that. He wasn't giving updates and current production numbers. The most logical inference, he didn't know them. This is a moving target day by day as a well test is done and production is – the process is undertaken. And then it's disclosed in November. So what would the possible motive be to mislead for three months? When did they begin – when did they come online? When did they begin – he said begin production. When they were beginning production, he made the statements of 7,000 barrels. My question is when did they come on – and then he restated that again in September 12th. How many production reports would Reese have gotten between that August and September 12th date? Were they monthly or weekly? Well, that's a mystery. What was the allegation? The allegation is one of the confidential witnesses said it was weekly. Another one said it was monthly. And someone who was a non-defendant officer was at a meeting. I mean there's nothing specific in the complaint tying any of this information to Mr. Reese, who is the speaker, and that's their obligation under the PSLRA. So the closest they come is he had access to information, which we know from Southland and Abrams is not sufficient. This is not the special circumstances case. It's not a one-trick pony company. He made the statement unequivocally in August, and in November they unequivocally back off of it. And they give the current number in November. That's right. But the question is, I don't know whether to read this pleading or not. It's given the reference that they knew from the very beginning that this was not going to be a 7,000 producer. When did they know that? See, that's the old classic question we have. What did you know? What did you learn? And we're handicapped because we're dealing with the parsing pleadings. Sometime between August and November, Your Honor. Well, I mean, when did they bring that well online? Did we know? Even online is apparently one of the vague terms. Mr. Reese, as quoted in the complaint, is talking about well tests and pressure tests and as we develop production. It sounds like it's a process. I don't have any more detail, and there's no more detail in the complaint. Okay. Go ahead. I've asked a lot. Go ahead. No, I'm still concerned about the liquidity issue. And if there's no safe harbor because it's a present statement, and I don't understand why we assume that there's no scienter on the idea that the ability to get financing and to have cash was the name of the game for this company going to make it viable going forward. Why isn't that in there, and why isn't that enough? Well, Your Honor, several things. We know, again, from the Owens case, that even in that case with Guarantee Bank, it was critical for them to have financing. That wasn't enough for the high inference and the strong inference of scienter, which is severe recklessness. And then the other part is more factual. The data supported the optimistic statements. When the company made the statements in 2012 that liquidity is strong, they had a quarter billion dollars in cash. That supports their optimistic statements, and any scienter is neutralized under this court's precedence because of the detailed and repeated and extensive warnings. Detailed and extensive warnings neutralizes their statement of present facts that was untrue? No, Your Honor. I just thought and went through that it actually was true because they were sitting on a quarter billion dollars of cash in the first quarter of 2012 when they made these statements, and there were detailed warnings that said we've got to keep production up. Liquidity may be an issue. Cash flow may be an issue. I mean, they had detailed warnings that Judge Vance went through. So my whole point is the statements were factually accurate. There's not an inference of scienter, and any scienter inference that could be drawn is an issue. January the 4th. January the 4th. We have a strong capital position in the fact that most of the company's 2012 projects are completely discretionary. We've got many levers to pull to bring in cash or to reduce capital. March the 16th, continuing, cash flow is improving. ATP continues to expand its liquidity. That's the injection of $200 million in the first quarter, Your Honor. That's exactly right. Did you want to address the tension in Mormon? It goes on. It continues in April. Liquidity is sound. I've heard all these comments about liquidity. What I'm saying, I'm not worried about the maturities of our debt. March, I mean, he's well up into April. And then in May, the same thing. There's a consistent pattern of maintaining that there is no liquidity problem. My impression I got was that we're sitting on a bunch of cash, but they weren't comfortable with that because they knew that cash was going to be gone in a flash. Well, that's right, Your Honor, and they disclosed that. This is a production company. If production does not continue or indeed accelerate, they're going to end up where they ended up. That's right. And, Your Honor, if I may briefly, I would like to address, because I do think for future litigation, securities litigation cases in particular. Do we have to decide that today? You do not, Your Honor, but I would say there is continued confusion. Southland did walk through, as Judge Higginbotham well knows, the careful parsing of the text of the safe harbor. It is disjunctive by its very nature. Both the Second Circuit, the Third Circuit, the Sixth, the Ninth, and the Eleventh all agree. It is disjunctive. It is not a conjunctive safe harbor, which, unfortunately, Lorman and several disconfort cases. Which one of those do you want? I would like the disjunctive, Your Honor, and it would be nice to have to stop confusion in the Fifth Circuit, and there's no confusion in any other circuit other than this circuit about the safe harbor and its disjunctive nature. So a clear statement that Southland is the Fifth Circuit rule would be helpful, but there's no question that it is disjunctive in its nature. Thank you. Thank you. I'd just like to make a couple of quick points. The first thing I'd like to say is about the disclosures in the financial statements and whether that was enough to neutralize the clear falsity, really, of these statements that were made concerning the liquidity. And we got this in our briefs, but this McCarroll guy, he's the new CEO. He comes on June 1st. He leaves in a week. He says, and I've got a quote there, but he says this is a turnaround. He expected a turnaround, but when he got there, he didn't have any idea how bad it was, and I'm paraphrasing there, and he advised the directors of the company, which Bowman is one, is to begin restructuring immediately. So if you've got a sophisticated fellow like McCarroll who's an oil and gas CEO and he can't even tell what's going on out there with the company's liquidity until he gets in there and gets a firsthand look at what it is, well, then certainly it's plausible that a reasonable investor is not going to be able to go in there. His statements, as alleged, don't say that he told the defendants why he was leaving, correct? That is true, but, I mean, it's pretty obvious that that would have come out. You've got to draw an inference there. I mean, he told them to start restructuring, that you've got to restructure, and they said no, and he quit. Well, I'll just have to ask the Court to draw an inference. What was the date of that? With McCarroll? Yeah, the breakup of that brief romance. Excuse me? What was the date of that breakup of that brief romance? Oh, the romance started on June 1 and it ended abruptly on June 7, and that's less than a month after the May statements, and it's a little more than a month, going on maybe two for the April statements. You know, the liquidity was just an absolute disaster during. That's my memory about your class framing time. How's your class? Well, the class was started in 2010, but we've decided we're just going to, we just focused our appeal, and that's all we've really briefed, is August 2011 through the end of the class period, August 17, 2012. Now, by the fall, well number four had turned out to be a disappointment. CW3, who left in October 11, said that the liquidity was bad then, and he said that they were getting way over, that ATP was getting way over leveraged, and that even if the Wells, this is a term he used, even if they produce like gangbusters, the company, gangbusters, quote-unquote, the company's not going to get any of it because it's all been, you know, given, the future production's been given away for present cash. Do you have a thought on the final point that if we do look at the forward-looking statements about liquidity and Clipper and we require actual knowledge because Southland controls, what in your allegations demonstrate actual knowledge? Well, some of the statements like the liquidity's pre-funded, that's not. No, I'm talking about the forward-looking. Oh, you're like, okay, yeah, the projections for revenues and completing the Clipper pipeline. The actual knowledge standard is going to apply to the forward-looking statements, regardless of whether you say Lorman applies or Southland. What Southland's, what defendants say Southland says is that if you've got meaningful cautionary language, well, then you can just lie all the hell, excuse my language, you can lie as much as you want. It doesn't feel right, but if the law is Southland. But I'll tell you, but we think Southland's dicta and Lorman's not, and so we think Lorman controls. But what some courts have done is they say, okay, we think it's disjunctive, but if you're saying something that you know is false, well, then your disclosures to be meaningful need to come right out and basically say the reasons, you know, why it's false, like this, this, this, and that. But our position is Lorman controls because Southland was really dicta and it didn't. It really, it referenced the disjunctive stuff, but it really, the decision came down to the actual knowledge standard. But to answer Your Honor's question again, actual knowledge will apply to forward-looking statements. Thank you, I think we have your argument. Okay, thanks.